

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-13-2005

# Thomas v. Dragovich

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3884

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Thomas v. Dragovich" (2005). *2005 Decisions.* Paper 863.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/863

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 02-3884

————

EARL THOMAS*,*

<u>Appellant</u>

v.

MARTIN L. DRAGOVICH, Superintendent; TOM HORNUING, Counselor;
Mr. STRADMAN, Unit Management; MARVA CERULLO,
Medical Health Care Administrator

————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 97-CV-05814)
District Judge: Honorable Petrese B. Tucker

————

Argued June 7, 2005

Before: FUENTES, VAN ANTWERPEN and BECKER, <u>Circuit Judges</u>.

(Filed:  July 13, 2005)

Stephen A. Anthony, Esq.
Harry B. Roback, Esq.(argued)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
    *Counsel for Appellant*

Gerald J. Pappert, Attorney General
Howard G. Hopkirk, Senior Deputy Attorney General (argued)
John G. Knorr, III, Chief Deputy Attorney General, Appellate Litigation
Theodore Lorenz, Esq.
Office of the Attorney General of Pennsylvania
Strawberry Square, 15th Floor

Harrisburg, PA 17120
*Counsel for Appellees*

———

OPINION OF THE COURT

———

VAN ANTWERPEN, <u>Circuit Judge</u>.

Appellant Earl Thomas filed a § 1983 claim against prison officials, alleging they were deliberately indifferent to a denial of medical treatment by prison doctors for his medical needs during his incarceration at SCI-Mahanoy, a Pennsylvania correctional facility, from September 1996 until February 1998. Thomas, who has hepatitis, seeks a new trial on the grounds that the District Court abused its discretion in excluding as irrelevant several of his trial exhibits pursuant to Federal Rules of Evidence 401 and 402. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291 and will affirm.

I.

Defendants in this case are Prison Superintendent Martin Dragovich and a prison health care administrator, Marva Cerullo.[1] Thomas' theory of liability is that Cerullo and Dragovich did nothing to assist Thomas despite allegedly knowing of refusals by prison medical staff to treat Thomas' hepatitis and, alternatively, of staff's prescription to him of contraindicated medicine. As a result, Thomas alleges, he suffered pain in his right side from lack of treatment. Prior to trial, Thomas marked as exhibits contemporaneous grievance forms that he had written to Cerullo and other staff stating his belief that (i) prison doctors and the medical staff were not treating his hepatitis

---

[1] Thomas does not challenge on appeal the District Court's grant of summary judgment as to the other defendants originally named in this action, Thomas Hornuing and George Stradtman, whom the District Court found lacked personal involvement in the alleged denial of medical treatment for Thomas' hepatitis.

2

and related pain; (ii) the medicines that the medical staff did provide him for his pain – at various times, aspirin, Tylenol and Motrin – were inappropriate and contraindicated for hepatitis; and (iii) the Defendants knew this, but did nothing. Space at the bottom of each form allows administrative staff to respond to inmates' grievances. Most but not all of Thomas' exhibits contain brief responses or comments written by Cerullo or other administrative staff.

Prior to trial, Defendants moved *in limine* to exclude all of Thomas' exhibits as irrelevant. The District Court initially granted the motion as to some twenty of Thomas' exhibits. Upon Thomas' motion for reconsideration, the District Court admitted three more of them for use in his case-in-chief and another eleven for impeachment, cross-examination, and rebuttal purposes.

The exhibits that were excluded in their entirety and/or limited in their admissibility to impeachment span a period of several months. They memorialize a range of complaints by Thomas, including his allegation that medical staff refused to either see him or treat him on specific dates; that medical staff had prescribed Tylenol and aspirin to him even though both are contraindicated for persons with hepatitis; and that he was experiencing pain on his right side. *See, e.g.,* Exhibit 16 ("The doctor told me that I am not suppose[d] to take these medicine[s] because I have hepatitis. It is making my liver wors[e]. My right side is hurting now."). As discussed, many of these exhibits also memorialized handwritten comments from Defendant Cerullo and other administrative staff. *See, e.g.,* Exhibit 35 ("If you don't want the Motrin don't take it.").

At the conclusion of a three-day trial, a jury found in favor of both Defendants, concluding by special verdict that while Thomas had proven he had a serious illness and that both Defendants were aware of his serious need for medical care, he had not proven their deliberate indifference to his claimed lack of treatment. Thomas subsequently moved for a new trial, arguing the District

Court had erred by excluding his exhibits, which he claimed were relevant to the issue of whether the Defendants had in fact been deliberately indifferent. The District Court denied the motion. This appeal followed.

## II.

We review a district court's evidentiary determinations for an abuse of discretion. *See Renda v. King*, 347 F.3d 550, 553 (3d Cir. 2003) (holding that an abuse of discretion standard applies to evidentiary rulings involving applications of the Federal Rules of Evidence); *see also Glass v. Philadelphia Elec. Co.*, 34 F.3d 188 (3d Cir. 1994). We also review for an abuse of discretion the District Court's denial of Thomas' motion for a new trial. *See, e.g., Pryer v. Slavic*, 251 F.3d 448, 453 (3d Cir. 2001). Finally, where a district court erroneously excludes evidence at trial, we may affirm a jury's verdict only if the evidentiary error was harmless. *Renda*, 347 F.3d at 356. An evidentiary error is harmless only if "'it is highly probable that the error did not contribute to the judgment.'" *United States v. Davis*, 183 F.3d 231, 255 (3d Cir. 1999) (quoting *Murray v. United of Omaha Life Ins. Co.*, 145 F.3d 143, 156 (3d Cir. 1998)).

## III.

Here, Thomas has pursued claims against administrative Defendants who are neither prison doctors nor on the prison's medical staff. Thomas alleges that they were deliberately indifferent not because they themselves denied Thomas medical attention, but because they had knowledge of a denial, yet failed to respond to his repeated requests for assistance.

The following brief summary of our deliberate indifference jurisprudence frames the question of evidentiary relevance before us in this appeal. In *Estelle v. Gamble*, 429 U.S. 97 (1997), the Supreme Court confirmed that the government has an "obligation to provide medical care for those

whom it is punishing by incarceration" and determined that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 103, 104 (citations and internal quotation marks omitted). The *Estelle* Court also determined that deliberate indifference may be manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05; *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.1999) (reiterating that deliberate indifference may be demonstrated by denying, delaying or preventing a prisoner from receiving needed or recommended medical treatment).

The Court in *Estelle* also instructed, however, that mere negligence does not violate the Eighth Amendment. *Id.* at 106. As a result, decisions by prison medical staff relating to the exercise of professional judgment, even though they may constitute medical malpractice, are not violative of the Eighth Amendment. *Id.* at 107; *see also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (reiterating *Estelle*'s distinction between deliberate indifference to serious medical needs and "mere negligence"); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir.1993) (acknowledging that a deliberate indifference claim requires that a prisoner demonstrate "more than negligence"). Similarly, and of particular importance in this case, "mere disagreement as to the proper medical treatment" is likewise insufficient to establish a Constitutional violation. *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977); *Massey v. Hutto*, 545 F.2d 45, 46 (8th Cir. 1976) (per curiam)).

In *Farmer*, the Court explained that the term "deliberate indifference" lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." 511 U.S. at 836. The Court instructed that

5

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; that is, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837. Thus, to demonstrate a prima facie case of cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that defendants acted "with deliberate indifference to his or her serious medical needs." *Estelle*, 429 U.S. at 104; *Durmer*, 991 F.2d at 67. There are two components to this standard: First, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious. Additionally, the plaintiff must make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir.2002). As such, we explained in *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004), that the *Estelle* "deliberate indifference to serious medical needs" standard is clearly met when a doctor is "intentionally inflicting pain on [a] prisoner[ ]," 897 F.2d at 109. And in *Monmouth*, we identified several other scenarios that satisfy *Estelle*, including "[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury," *Monmouth*, 834 F.2d at 346 (internal quotation omitted), or "where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care.'" *Id*. (internal quotation omitted) (alteration in original).

As we have stated, Thomas' claim is against administrative Defendants who are not prison doctors or medical staff. Thomas alleges that Defendants were deliberately indifferent not because they themselves denied Thomas medical attention, but because they knew of a denial yet failed to

6

help. Given the theory of liability advanced by Thomas, one facet of our deliberate indifference jurisprudence remains to be discussed: the relationship between an alleged denial of medical care and an administrator's – as opposed to a doctor's or medical staff member's – alleged deliberate indifference to that possibility.

In previous cases, we have we concluded that such administrators could not be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer*, 991 F.2d at 69. As we later explained in *Spruill,* "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill*, 372 F.3d at 236 (discussing *Durmer*, 991 F.2d at 69). We further concluded in *Spruill* that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236.

IV.

With these governing standards of deliberate indifference in mind, we turn to Thomas' contention on appeal that all of his grievance exhibits were relevant. Rule 401 of the Federal Rules of Evidence defines relevant evidence as anything "having tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. As may be seen from this language, the threshold for relevance is low. Taken in combination with the fact that Thomas' contested exhibits each contemporaneously memorialize either (i) his perceptions as to treatment and medication, (ii) the administrative staff's awareness and responses to those perceptions, or (iii) both, the low threshold

for relevance established by Rule 401 causes us to assume in this appeal that all of Thomas' exhibits were relevant to his claim of deliberate indifference against the Defendants. Indeed, counsel for Defendants conceded as much at oral argument, and to reach a contrary conclusion would seem almost impossible. Each of Thomas' contested exhibits plainly tends to make the existence of facts of consequence to his claim either more probable or less probable than they would otherwise be without this evidence. *See* Fed.R.Evid. 401.

The District Court also appears to have excluded the exhibits because they were "self-serving." But Thomas' proposed exhibits were contemporaneous communications that reflected the information that was available to the defendants and, in some cases, their responses to it. Because Thomas sought to introduce them to show notice to defendants, *i.e.*, their state-of-mind, the documents were not barred as hearsay. The mere fact that many of the letters were written by Thomas and allegedly favorable to his case did not justify exclusion either, so long as the documents were relevant. In any event, since the authenticity of the documents is not at issue, and since defendants would have had the opportunity to cross-examine Thomas on the content of the letters, the central concerns usually raised by "self-serving evidence" do not apply.

V.

Our analysis does not end with the question of relevance, however, as we must ask whether the error requires reversal. Under the Federal Rules of Evidence, a district court's evidentiary rulings do not constitute reversible error "unless a substantial right of a party is affected." Fed.R.Evid. 103(a). "Under this test, a reviewing court should affirm the District Court despite the error if the reviewing court believes 'that it is *highly probable* that the error did not contribute to the judgment . . . .'" *Renda v. King*, 347 F.3d 550, 556 (3d Cir. 2003) (citing

*McQueeney v. Wilmington Trust Co.*, 779 F.3d 916, 924 (3d Cir. 1985) (internal citation omitted) (emphasis in original). For each of the following two reasons, we conclude that it is highly probable that the District Court's error did not contribute to the jury verdict in favor of the Defendants.

First, at trial, in addition to his own testimony, Thomas presented the testimony of an expert in gastroenterology and hematology as well as that of a doctor who treated Thomas for hepatitis after he was transferred to another correctional facility, SCI-Greensburg. Defendants, in turn, presented their own testimony, the testimony of Thomas' treating physician at SCI-Mahanoy, and the expert testimony of the Assistant Medical Director for the state of Pennsylvania. It was undisputed from all of this testimony that Thomas was seen regularly, if not frequently, by the prison doctor and medical staff; that he was given blood tests on a regular basis to monitor his liver functions; and that Thomas' blood tests, although elevated, remained stable. It was further undisputed from the testimony that the prison doctor and medical staff had also treated Thomas on an on-going basis by placing him on a low fat diet, providing him with vitamins, and by administering several varieties of pain medicine, including aspirin, Tylenol and Motrin. As to the pain medicine, it was also undisputed that Thomas was advised that these medicines were contraindicated for persons with hepatitis and thus were only for short-term use. The record shows a dispute existed only as to the standard of care for hepatitis, specifically, whether the prison doctor should have also prescribed to Thomas the drug Interferon, which Thomas requested and which was available, although apparently not normally dispensed, at SCI-Mahanoy.

Thomas' contested exhibits do not undercut or impeach any Defendant's testimony, nor

do they undercut or impeach the critical fact that Thomas was seen by doctors and was receiving medical treatment. The evidentiary value of Thomas' contested exhibits is thus negligible, and therefore all but dispositive to the critical question of whether "it is highly probable that the error did not contribute to the judgment." *Renda*, 347 F.3d at 556. At most, they show only that Thomas did not like the treatment he was receiving, that he still had some pain, and that he still had concerns about the over-the-counter pain medicines he was given.

Second, Thomas' contested exhibits provided Thomas no net gain in evidentiary value: for every contested exhibit containing evidence tending to support Thomas' theory of liability, another one of his exhibits tended to undercut it, in favor of Defendants. Because the jury was not in any different position than it would have been had it seen all of Thomas' exhibits, there exists a high probability that the error therefore did not contribute to the judgment. *Id.* Here, our conclusion is formed not only by our review of the contested exhibits, but also by the legal standards necessary to support a claim for deliberate indifference in the scenario presented by Thomas' theory of liability here. Thomas' contested exhibits do not tend to show that Defendants Dragovich and Cerullo, who are undisputably administrators, not doctors, possessed "'knowledge of the need for medical care [accompanied by the] . . . intentional refusal to provide that care.'" *Id*. (internal quotation omitted). Thomas' exhibits only confirm that Cerullo had a belief that Thomas was under the care of the prison doctor and medical staff, placing her within the scope of our decision in *Spruill*, 372 F.3d at 236 ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). Thomas' contested exhibits provide no new support that either Cerullo or Dragovich possessed actual knowledge or a reason to believe that "prison doctors or their

assistants [were] mistreating (or not treating) [Thomas]." *See id.* at 236. Finally, as to Cerullo's responses to Thomas that were memorialized in the contested exhibits, the jury could not have found that she did anything more than "fail[] to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer*, 991 F.2d at 69. As counsel contended at oral argument, it appears true that Cerullo could have been more helpful to Thomas by undertaking such actions as forwarding some of Thomas' grievance forms to the medical staff or doctors, or even speaking with them directly, to make sure Thomas was heard. That said, a failure to undertake such actions or others like them does not constitute deliberate indifference, and may not be legally recognized as such. *Id*.

For both of these reasons, we conclude that it was highly probable that the District Court's evidentiary ruling did not contribute to the judgment.

VI.

We have considered the remaining arguments advanced by the parties and conclude that no further discussion is necessary. Accordingly, the jury verdict and the order of the District Court denying Thomas' motion for a new trial are affirmed.

BECKER, *Circuit Judge*, dissenting.

I agree with the majority that the District Court erred in excluding Thomas's contested exhibits. I disagree, however, that the error was harmless, and I would therefore reverse and remand for a new trial.

I.

Judge Van Antwerpen's Opinion of the Court quite rightly concludes that it was error for

11

the District Court to exclude Thomas's proffered exhibits as irrelevant, and that "to reach a contrary conclusion would seem almost impossible." *Ante* at 7. The low threshold for relevance under Rule 401, and the plain connection between the grievances and Thomas's legal claims, compels this conclusion. I would add that the District Court's statements that the disputed documents were "self-serving," and "merely a recitation by Mr. Thomas of the events," provided no reason to find them irrelevant under Rule 401. The fact that a document is self-serving may provide some reason for a jury to discount its probative value, but it surely does not destroy "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

## II.

I part company with the majority, however, when it concludes that the District Court's error was harmless. To provide context for my conclusions, I will first briefly describe the relevant contested exhibits and the responses thereto.

Exhibits 16-18, from mid-to-late October 1997, memorialize Thomas's complaints that his right side hurt, and that a physician's assistant kept giving him contraindicated medication (Tylenol and similar painkillers). Cerullo replied to Exhibit 16, "You were seen at sick call today and resolved your own problem."

Exhibits 19, 21, and 22 are similar to Exhibit 20, which the District Court did allow into evidence. In each of these grievances (from later in October), Thomas complained that the physician's assistant refused to treat him for pain in his right side, and that he prescribed contraindicated Tylenol. Cerullo replied to Exhibit 21 that Thomas should discuss these issues

12

with the doctor. In Exhibit 23, dated November 11, Thomas replied that he had seen the doctor and would like to meet with Cerullo. This meeting does not seem to have occurred.

Exhibits 25, 26, and 29, from mid-November 1997, constitute an odd sideshow to this case: Thomas repeatedly complains about an apparent clerical error that led Cerullo to believe that he stayed overnight at the infirmary. As far as we can tell, the question whether Thomas stayed overnight was of no importance. Administrators told Thomas that it was an honest mistake, but he took it extremely seriously, alleging that the staff's mistake constituted criminal "tampering with public records."

Exhibits 31 and 32, which were excluded from any use at trial (including impeachment), come from early December of 1997. They are Thomas's responses to Dragovich's November 25 letter, which was admitted into evidence as Exhibit 30. In Exhibit 30, Dragovich stated that, because Thomas "formerly had hepatitis," short-term use of Tylenol in small doses might be permissible under the direction of a doctor or physician's assistant. Thomas replied that hepatitis is incurable, so he did not "formerly" have it, and that he had been prescribed contraindicated medicines for fourteen months, which he did not consider to be short-term.

Exhibit 33, also excluded entirely, was a general complaint to Cerullo: "Miss Cerullo: Why do you want me to ke[ep] sig[n]ing up for sick call, when you and your staff [k]no[w] what the problem is[?] Miss Cerullo I am 1 of the 26,000 inmates. So why aren't I getting the proper treatment. Read this!" Cerullo's entire response, at the bottom of the form, is "Mr. Thomas—Thanks for the info."

Finally, Exhibits 34-35 concern an episode in which Thomas went to a dentist, who wanted to pull his tooth but could not do so for ten days because of staff shortages. The dentist

prescribed him Motrin for the pain; Motrin is contraindicated for hepatitis. Cerullo's rather brusque response to Thomas's complaints, at the bottom of Exhibit 35, includes the sentence "If you don't want the Motrin don't take it."

Taken together, these exhibits tend to establish a number of propositions. First, they suggest that Thomas was constantly and repeatedly given contraindicated medications. These medications were not prescribed by the prison doctor, who had apparently told him that they were contraindicated; rather, they were prescribed by the physician's assistant or by the dentist.

Second, they suggest that Thomas's complaints of pain were sometimes ignored or treated cavalierly by medical staff. When Thomas went to the physician's assistant with a complaint of pain in his right side, the physician's assistant once (allegedly) sent him away without treatment or an explanation. When his tooth needed to be pulled, he was left to languish for ten days with no treatment except a painkiller that could have aggravated his hepatitis.

Third, and most importantly, they demonstrate that Cerullo (and, to a lesser extent, Dragovich) was aware of these problems. A jury might be able to infer, from the defendants' responses on the grievance forms and from Thomas's continued complaining, that Cerullo and Dragovich did not take Thomas's concerns very seriously.

### III.

"A determination of harmless error depends on whether 'it is highly probable that the error did not contribute to the judgment.'" *Advanced Med., Inc. v. Arden Med. Sys., Inc.*, 955 F.2d 188, 199 (3d Cir. 1992) (citing *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir.1985)). This is a "rigorous" test. *Id*. at 200.

The majority correctly summarizes the jurisprudence of deliberate indifference. Mere

14

medical malpractice is not an Eighth Amendment violation. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). But knowledge of and indifference to "an excessive risk to inmate health or safety" is such a violation. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This two-part standard "requires deliberate indifference on the part of the prison officials and it requires the prisoner's medical needs to be serious." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (quoting *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978)).

There is no doubt that Thomas had a serious medical condition: hepatitis C can have severe and even fatal consequences. Furthermore, a jury could find that the neglect and mistreatment that he alleges in his grievances were similarly serious. While the parties have not directed our attention to any discussion of the dangers of Tylenol and other contraindicated medications to hepatitis patients, Thomas's allegations about them stand unrefuted in the record, and it stands to reason that someone with a serious liver disease like hepatitis should not be prescribed contraindicated liver-damaging medications.

The other prong of the test, requiring that defendant prison officials be deliberately indifferent to the inmate's needs, is difficult to meet when the defendants are not the medical personnel who treated the prisoner.[2] In *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993), we affirmed summary judgment in favor of a warden and corrections commissioner on the basis that "[n]either of these defendants . . . is a physician, and neither can be considered deliberately

---

[2]I note that Cerullo *is* a medical officer: she was the Health Care Administrator at SCI—Mahanoy at the relevant times, and was trained as a nurse. While her duties did not include treating patients, she was admittedly responsible for supervising the medical staff and outside medical vendors, although her supervision seems to have involved mainly administrative issues rather than treatment decisions.

indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." We clarified that decision last year, writing:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. . . . Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

These cases, and particularly *Durmer*'s sweeping language, provide prison officials with broad discretion to leave prisoners in the hands of medical personnel. But, as *Spruill* recognizes, that discretion is not absolute: if the officials have reason to believe that medical personnel are mistreating or not treating the prisoner, they may not simply turn a blind eye to the problem. Instead, *Spruill* suggests some duty to investigate evidence of misfeasance or nonfeasance by medical personnel. Indeed, it is difficult to think of clearer reasons to suspect misfeasance or nonfeasance than the actual contemporaneous complaints of the prisoner. When Thomas wrote that "the assistant physician Rush refuse to treat me" (Exh. 19), Cerullo had reason to believe that the physician's assistant was not treating him. When Thomas wrote that "I have been taking [Tylenol] for *14 months* NOT short term, Miss Cerullo said that long term [use] could affect you. But it would be *contraindicated* or *inadvisable*" (Exh. 31, emphasis in original), Dragovich had reason to believe that the medical staff was mistreating him. Both of these complaints, and many others like them, were excluded from use as evidence at trial.

Thomas presented significant expert evidence about the proper treatment for hepatitis, but his only evidence of the defendants' alleged neglect was his own testimony. The grievances at issue here would have provided substantially more cogent, detailed, and credible evidence of

16

Thomas's troubles and the defendants' alleged failure to act on them. Read charitably, they might establish in a jury's mind "reason to believe . . . that prison doctors or their assistants are mistreating (or not treating) a prisoner," *Spruill*, 372 F.3d at 236, and might thus convince the jury that the defendants were deliberately indifferent. I am not sure that this result is likely, but I cannot conclude that it is "highly probable" that such evidence would have no effect on the verdict.

## IV.

The majority finds two reasons that the District Court's error was harmless. First, it discusses the medical evidence regarding the standard of care for hepatitis. It notes that the prison doctor put Thomas on a special diet and monitored his blood tests for hepatitis symptoms, but did not actively treat his hepatitis using Interferon, which was available at the time. I do not gainsay that this course of conduct, although perhaps not state of the art, was constitutionally adequate. While Thomas's expert witness, a prominent gastroenterologist, testified that Interferon was standard treatment for hepatitis in 1997 and 1998, the defendants produced evidence that it was not even approved by the FDA at that time, and that the prison's doctor (an outside contractor) gave his private-practice patients the same hepatitis treatment that he gave Thomas. I think that any reasonable jury would find that the course of treatment given to Thomas was adequate.

But the contested grievances, and Thomas's lawsuit, are not solely about the course of treatment prescribed by the prison doctor. Indeed, the doctor is not even a defendant here. Instead, Thomas's suit is about the cavalier treatment that he claims to have received at the hands of prison medical staff (particularly the physician's assistant responsible for most of his day-to-day treatment), and the defendants' failure to do anything to fix this problem. As Thomas's

17

attorney put it in his closing argument: "The issue in this case . . . is not about second guessing medical decisions. . . . You don't even get to second guess treatment decisions when you have a refusal to treat in the first place."

The staff's alleged unconcern about Thomas's complaints did more than offend his dignity; it also had possible medical consequences. Thomas was given Tylenol and other painkillers by several medical staff members—though not, it seems, by the supervising doctor—which might have aggravated his hepatitis. The majority states that "it was . . . undisputed that Thomas was advised that these medications were contraindicated for persons with hepatitis and thus were only for short-term use." *Ante* at 8. Certainly Thomas was informed that long-term use of painkillers was dangerous, but I am not sure that the majority has correctly characterized the painkiller issue. It seems to me that, while the doctor (and Thomas) was aware that Tylenol was contraindicated for Thomas's condition, medical personnel nonetheless gave him Tylenol on a frequent basis for fourteen months, with no understanding or further warnings about its possible dangers.

Additionally, complaints of pain were occasionally ignored. A painful tooth was not pulled, and Thomas's pain was treated only via contraindicated Motrin. These decisions may have caused Thomas needless pain, or permanent liver damage; they certainly seem to have increased his fear and anxiety about living with a serious illness. Thomas's grievances, if admitted into evidence, might have convinced a jury that Thomas was not given adequate medical care, even if that jury believed (as I do) that the decision not to prescribe Interferon was itself proper.

The majority next states that "Thomas' contested exhibits provided Thomas no net gain

18

in evidentiary value: for every contested exhibit containing evidence tending to support Thomas' theory of liability, another one of his exhibits tended to undercut it." *Ante* at 9. This cannot be the proper legal standard: the fact that some of the excluded evidence might have helped the defendants does not render it "highly probable" that, in the aggregate, it would not have helped the plaintiff. Juries can pick and choose, and often do.

At all events, I am not convinced by the majority's claim that these exhibits would have provided no net gain. Perhaps they "confirm that Cerullo had a belief that Thomas was under the care of the prison doctor and medical staff," *ante* at 9-10, but, as I have explained above, that does not completely immunize Cerullo (or Dragovich) from Eighth Amendment liability. And I disagree with the majority that the "contested exhibits provide no new support" for the deliberate indifference claim. Rather, they are a litany of complaints from Thomas that "prison doctors or their assistants [were] mistreating (or not treating) him," *Spruill*, 372 F.3d at 236, with occasional offhand replies from Cerullo that might be read as indicating indifference and, indeed, callousness. This is exactly the sort of evidence that can establish deliberate indifference, and without being allowed to offer it, Thomas's ability to present his case was severely curtailed.

For the reasons given above, I cannot conclude that it is "highly probable" that the District Court's error in excluding Thomas's grievances did not contribute to the jury's verdict in this case. I therefore respectfully dissent.